IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT A. EDELMAN,

                Plaintiff,

      v.

ROOFERS' PENSION FUND,

                Defendant.

Case No. 12 C 8221

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Edelman ("Edelman") brings this action pursuant to Section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, seeking review of the Defendant Roofers' Pension Fund's (the "Fund") decision denying him disability pension benefits.  Presently before the Court are Cross-Motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure [ECF Nos. 15 & 24], and the Fund's Motion to Strike Evidence Outside of the Administrative Record [ECF No. 20].  For the reasons stated herein, the Fund's Motion for Summary Judgment and Motion to Strike are granted.  Edelman's Motion for Summary Judgment is denied.

## I.  BACKGROUND

Edelman is fifty-one years old and was employed as a roofer at Sullivan Roofing, Inc. until November 11, 2011.  He was a

participant in the Fund's multi-employer pension benefit plan (the "Plan"), which provided disability benefits to eligible employees. To qualify for benefits under the Plan, a participant must show that he is "totally and permanently disabled." This requires proof of "a physical or mental condition that permanently prevents [the participant] from engaging in any occupation or performing any work for wage or profit."

On December 12, 2011, Edelman filed an application for disability benefits under the Plan, in which he alleged that he became disabled on November 11, 2011, due to Chronic Obstructive Pulmonary Disease ("COPD") and related complications. In connection with that application, Edelman submitted medical records indicating that, from November 11 to November 14, 2011, he had been hospitalized for fever, wheezing, shortness of breath, and a cough that had persisted for two weeks. While in the hospital, Edelman was examined by Dr. John Kyncl, an internist, and Dr. Beth Ginsberg, a consulting pulmonologist. Both Dr. Kyncl and Dr. Ginsberg noted Edelman's history as a heavy smoker and diagnosed him with COPD exacerbation, atelectasis (collapse or closure) of the lung bases, and a respiratory tract infection. Edelman was prescribed antibiotics, steroids, and nebulizer treatments.

After being discharged, Edelman continued treatment with Dr. Kyncl. At a follow-up examination on December 3, 2011, Edelman

reported that he experienced "passing out symptoms" associated with his cough. Dr. Kyncl diagnosed Edelman with COPD and syncope (the medical term for fainting or passing out).

The following day, Edelman was hospitalized again after complaining of increased shortness of breath. Dr. Kyncl ordered a full medical evaluation, noting his concern that Edelman's job as a roofer placed him at an increased likelihood for injury if he were to pass out at work.

Edelman was examined first by Dr. David Bicknell, an electrophysiologist. Dr. Bicknell observed that Edelman had a six to seven year history of cough-induced syncope. Edelman reported to Dr. Bicknell that, although he never had lost consciousness or experienced "blackouts," he felt dizzy or lightheaded following coughing episodes and sometimes would need to grab onto something or sit down. Edelman stated that, although his condition had improved over the years, he still experienced symptoms several times per month. Dr. Bicknell concluded that Edelman suffered from "significant lung disease, shortness of breath, and dyspnea on exertion, likely related to COPD, in addition to a history of cough-related near syncope and syncope." Dr. Bicknell recommended treatment for Edelman's underlying cough symptoms and a follow-up appointment in three to four weeks.

On the same day, Edelman saw Dr. Robert Koch for a cardiology consultation. Dr. Koch assessed Edelman as having no coronary symptomology, but ordered additional tests to exclude the possibility that his syncope was the result of any carotid or coronary condition.

Edelman also was examined by Dr. Dennis Hoffman, a pulmonologist. Dr. Hoffman noted that Edelman's chest x-ray results revealed no acute pulmonary findings. Edelman's myocardial stress test was normal and a carotid Doppler study did not show any significant plaque or stenosis. Dr. Hoffman assessed Edelman as having COPD and cough-related syncope, although he noted that Edelman's cough was "markedly improved" since his prior hospitalization. Dr. Hoffman recommended bronchodilator treatments by nebulizer, systemic steroids to minimize his cough, and an oxygen tank to ensure that Edelman's oxygen saturation remained at levels between 92 and 95 percent.

Dr. Kyncl's final diagnosis upon discharge was that Edelman suffered from cough-induced syncope and near-syncope, COPD exacerbation with end-stage lung disease, oxygen and steroid dependence, weight gain, and hypercholesterolemia (high levels of cholesterol in the blood). Dr. Kyncl reported that, despite having been treated with various medications, Edelman continued to experience symptoms of shortness of breath and near-syncope.

Edelman saw Dr. Koch for a follow-up appointment on January 4, 2012. In his treatment notes, Dr. Koch indicated that Edelman continued to suffer from shortness of breath, cough, difficulty breathing, and dizziness related to his syncope. Dr. Koch posited that Edelman's syncope was related to bradycardia (an abnormally slow heart rate). He referred Edelman to a cardiologist to determine whether a pacemaker would be required. Dr. Koch also noted that Edelman might be suffering from obstructive sleep apnea. Further testing confirmed that Edelman suffered from clinically significant oxygen desaturations, but that his condition could be treated through the use of oxygen and a Continuous Positive Airway Pressure ("CPAP") titration mask.

On January 16, 2012, Edelman saw Dr. Mehran Jabbarzadeh, a cardiologist, who confirmed that his syncope was not attributable to any cardiac condition. Dr. Jabbarzadeh recommended against the implementation of a pacemaker and instead suggested treatment for Edelman's underlying cough symptoms.

In February 2012, Edelman again saw Dr. Kyncl after being hospitalized for a kidney stone. Dr. Kyncl assessed Edelman's COPD as "severe" and stated that had "strongly encouraged [Edelman] to stop smoking again." Dr. Kyncl further observed that Edelman was "unable to work," although he did not indicate whether this was a restriction from his current job or from all types of work.

As part of his application for disability benefits, Edelman submitted "attending physician statements" from Dr. Kyncl and Dr. Hoffman.  Dr. Kyncl opined in his statement that Edelman suffered from severe functional limitations and was disabled from his current job and all other work.  He stated that Edelman was incapable of sedentary activity and that he was not a suitable candidate for trial employment at his own or any other job.  Dr. Kyncl noted, however, that Edelman's condition might improve over time and that he would be willing to revisit his assessment at a later date.

Similarly, Dr. Hoffman opined that Edelman was totally disabled from his job.  Contrary to Dr. Kyncl's finding, however, Dr. Hoffman found that Edelman would be a suitable candidate for trial employment at a different job.  Specifically, he noted that Edelman might be capable of performing non-exertional work.

On January 18, 2012, Dr. Scott Kale, an independent specialist in internal medicine, reviewed Edelman's medical records at the Fund's request.  Dr. Kale acknowledged that Edelman's conditions rendered him incapable of working as a roofer, but asserted that the objective medical evidence did not demonstrate an inability to function at any job.  Specifically, Dr. Kale noted that the record was silent as to Edelman's functional capacity with the use of oxygen, discontinuation of smoking, and other remedial methods that might be used to treat

his underlying pulmonary condition.  Dr. Kale concluded that, while Edelman was unable to function in a work environment that required exertion and balance, the medical evidence did not establish that he was incapable of performing sedentary work, where such concerns were not an issue.

Based upon Dr. Kale's review, the Fund determined that Edelman had failed to prove that he was totally and permanently disabled such that he was unable to perform any work for wage or profit.  Consequently, on January 30, 2012, the Fund denied Edelman's claim.

On February 8, 2012, Edelman appealed the Fund's benefits determination.  Thereafter, he submitted an additional attending physician statement from Dr. Koch.  Dr. Koch's statement indicated that Edelman suffered from moderate functional limitations, but was capable of sedentary activity.  Although Dr. Koch noted that Edelman's syncope seemed "not recoverable" and that he was disabled from his current job, he offered no opinion as to whether he could perform other work.

On February 29, 2012, the Fund forwarded Edelman's medical records to the Medical Review Institute of America, Inc. (The "MRIoA") for further review by an independent medical consultant. In a report dated March 5, 2012, Dr. Maroun Tawk, a MRIoA physician board certified in internal medicine, sleep medicine, critical care medicine, and pulmonary disease concluded that,

although Edelman was unable to work as a roofer due to his recurrent syncope, the medical evidence did not support a finding of total and permanent disability or an inability to engage in any other occupation. As Dr. Tawk explained, Edelman suffered from dyspnea that occurred mainly with exercise and a COPD-induced cough that sometimes was severe enough to cause syncope or near-syncope. Dr. Tawk noted that Edelman's cough had been improving through treatment with systemic steroids. Dr. Tawk further observed that Edelman's oxygen saturation levels were normal. After a full review of the medical records, Dr. Tawk concluded that Edelman was capable of performing sedentary work.

On March 1, 2012, Edelman requested that the Fund defer its review of his appeal pending his submission of additional medical evidence. Subsequently, Edelman tendered a Residual Functional Capacity ("RFC") evaluation authored by Dr. Kyncl, stating that Edelman was able to sit for more than two hours and stand for more than one hour at a time, but could sit, stand, or walk for less than two hours total in an eight-hour workday. Dr. Kyncl further found that Edelman was capable of carrying less than ten pounds on an occasional basis.

Edelman also submitted a chest x-ray showing medial right basilar atelectasis or scarring, and a stress echocardiography report which revealed normal results and the absence of any ischemia, arrhythmia, or angina. In addition, Edelman tendered

Dr. Hoffman's treatment notes from an examination on December 11, 2011.  At that examination, Edelman reported that he had experienced an episode of cough-related syncope while lying on his couch.  Dr. Hoffman observed that Edelman had shortness of breath on exertion, but that his breathing had improved since he discontinued smoking.  Dr. Hoffman further noted that Edelman had diminished but clear breath sounds, a regular heart rhythm, and oxygen saturation at 96 percent on room air.  Dr. Hoffman assessed Edelman as having severe COPD and found him appropriate for "disability in his current career" as a roofer.  He encouraged Edelman to participate in pulmonary rehabilitation.

In addition to these materials, Edelman submitted a copy of a decision of the Social Security Administration ("SSA") finding him eligible for disability benefits as of May 2012 due to "chronic pulmonary insufficiency."  The SSA file included an RFC assessment completed by Dr. Richard Blinsky, who evaluated Edelman's medical records as part of the SSA's review process. Dr. Blinsky assessed Edelman as being capable of nearly a full range of sedentary work.  Specifically, he found that Edelman could lift ten pounds occasionally and less than ten pounds frequently.  Dr. Blinksy further noted that, although Edelman was able to stand or walk for less than two hours per day, he could sit for approximately six hours in an eight-hour workday (the assessment form contained no option for the ability to sit for

more than six hours). Dr. Blinsky also assessed Edelman as having no postural limitations, except to the extent that his shortness of breath impeded his ability to crouch or climb ramps, stairs, ladders, ropes, and scaffolds. Although an initial review of Edelman's pulmonary function test results confirmed "severe obstruction," he demonstrated significant improvement "postmed." Dr. Blinsky concluded that Edelman did not have an impairment that met or equaled any of the Listings set forth in 20 C.F.R. Pt. 404, Subpt. P, App'x 1. *See,* 20 C.F.R. § 404.1520(a)(4)(iii).

Edelman's SSA file also contained notes from a consultative examination with Dr. Dennis Malecki, who observed that Edelman exhibited mild shortness of breath at rest and tachypnea (rapid breathing) and increased shortness of breath with minimal exertion. Although Edelman reported that he used oxygen at home, Dr. Malecki noted that he did not use it during the examination. Dr. Malecki stated that Edelman "displayed moderate difficulty with essentially all physical activity with increasing tachypnea and at time[s] audible wheezing." Nonetheless, Edelman's gait was normal, he experienced no difficulty getting on or off the examination table, he was able to squat and rise with mild difficulty, and "[s]itting and standing were unremarkable."

The SSA file contained a further RFC evaluation completed by SSA physician Dr. George Andrews. Dr. Andrews determined that

Edelman had the capacity to lift ten pounds occasionally, lift less than ten pounds frequently, stand or walk for six hours, sit for six hours, and push or pull without limitation. Dr. Andrews further opined that Edelman had no limitations in stooping, kneeling, crouching, or crawling, but that he could climb and balance only occasionally due to his shortness of breath.

The Fund forwarded Edelman's additional evidence to MRIoA for an updated review. On July 13, 2013, Dr. Tawk completed a revised report, stating that Edelman's supplemental materials did not change his previous determination and that Edelman could not be considered totally and permanently disabled under the Plan's terms. Dr. Tawk made particular note of Dr. Malecki's findings and Edelman's pulmonary function test results, which indicated that Edelman's "forced expiratory volume" per second ("$FEV_1$") was 56 percent of the predicted value and that his oxygen saturation on room air was at 95 percent. Comparing these results with the American Medical Association's Disability Guidelines, Dr. Tawk opined that Edelman was only 30 to 45 percent impaired. He found that Edelman was capable of sitting for six hours in an eight-hour workday and that he could push and pull with no limitation. Dr. Tawk concluded that, although Edelman was incapable of work that required straining, exercise, lifting, driving, or the operation of heavy machinery, he could perform sedentary tasks, such as office work.

On July 17, 2012, the Fund provided Edelman with a copy of Dr. Tawk's updated MRIoA report. The following day, Edelman asked the Fund to consider a further RFC evaluation from Dr. Hoffman, dated July 12, 2012. In his updated assessment, Dr. Hoffman stated that Edelman could sit for only thirty minutes and stand for forty-five minutes at a time, sit or stand for less than two hours total per day, never carry any weight whatsoever, and rarely twist or stoop.

After reviewing this additional evidence, Dr. Tawk issued a final report, stating that Edelman's newly submitted information "d[id] not change [his] previous determination." He concluded that there was no medical evidence that Edelman was incapable of performing sedentary work at a part-time job in a modified working environment that did not require exercise or lifting and was free of smoke or perfumes.

On July 27, 2012, the Fund issued a final determination, upholding its initial denial of Edelman's claim for benefits. The Fund explained that, due to the inconsistencies in the three attending physician statements, it sought an independent review of Edelman's medical records. Based upon the findings of Drs. Kale and Tawk, the Fund determined that Edelman was not totally and permanently disabled according to the Plan rules. The Fund concluded that the record as a whole suggested that Edelman was capable of performing sedentary work and, therefore, was not

precluded permanently from engaging in any occupation or performing any work for wages or profit.

## II.  STANDARD OF REVIEW

Under ERISA, a plan administrator's denial of benefits is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). Where, as here, the plan grants discretionary authority to the administrator, a decision denying benefits may be set aside "only if it is arbitrary and capricious." *Black v. Long Term Disability Ins.,* 582 F.3d 738, 743-44 (7th Cir. 2009).

Under the arbitrary and capricious standard, the Court does not consider "whether the administrator reached the correct conclusion or even whether it relied on the proper authority." *Kobs v. United Wis. Ins. Co.,* 400 F.3d 1036, 1039 (7th Cir. 2005). Rather, the only inquiry is whether the administrator's decision was "completely unreasonable." *Manny v. Cent. States, Se. and Sw. Areas Pension and Health and Welfare Funds,* 388 F.3d 241, 243 (7th Cir. 2004). In sum, the arbitrary and capricious standard is the "least demanding form of judicial review of administrative action, and any questions of judgment are left to the administrator of the plan." *Trombetta v. Cragin Fed. Bank*

*for Sav. Employee Stock Ownership Plan,* 102 F.3d 1435, 1438 (7th Cir. 1996).

### III.  MOTION TO STRIKE

In support of his Motion for Summary Judgment, Edelman submitted evidence of an award of disability benefits he received from the National Roofing Industry Pension Fund ("NRIPF"), which he contends "corroborates the Fund's grossly insufficient and biased denial of [his] meritorious claim."  (Pl.'s Mem. in Opp. to Def.'s Mot. for Sum. J. ("Pl.'s Opp. Mem.") at 13, ECF No. 28).  The Fund has moved to strike this evidence because the NRIPF award was rendered after the Fund issued its benefits determination and thus was not a part of the record considered by the plan administrator.

Under the arbitrary and capricious standard, the Court's review is limited to the administrative record.  *Krolnik v. Prudential Ins. Co. of Am.,* 570 F.3d 841, 843 (7th Cir. 2009). Therefore, the Court considers only those materials that were before the plan administrator when it reached its decision. *Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan,* 102 F.3d 1435, 1438 n.1 (7th Cir. 1996).

Edelman concedes that the NRIPF award was not part of the administrative record that the Fund considered when it rendered its benefits determination.  Rather, he contends that the award evidences the Fund's "fiduciary unfaithfulness" and "procedural

misconduct" in reviewing his claim.  Although evidence beyond the record may be considered when it is relevant to show a conflict of interest, misconduct, or bias on the part of the plan administrator, *Finlay v. Beam Global Spirits & Wine, Inc.,* 872 F.Supp.2d 730, 734 (N.D. Ill. 2012), the mere fact that the NRIPF's benefits determination was contrary to the Fund's does not prove the existence of bias or misconduct.  Accordingly, Edelman's application for NRIPF benefits and the NRIPF's subsequent award, annexed as Exhibits 1 & 2 to Edelman's Local Rule 56.1 Statement of Facts [ECF Nos. 17-1 & 17-2] are stricken.

## IV.  MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it might affect the outcome of the suit.  *Id.* If the moving party satisfies its burden, the non-movant must present evidence sufficient to demonstrate that a genuine factual dispute exists.  *See*, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  In doing so, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." *Sarver v. Experian*

*Info. Sys.,* 390 F.3d 969, 970 (7th Cir. 2004). Rather, it must demonstrate "through specific evidence that a triable issue of fact remains on issues for which the nonmovant bears the burden of proof at trial." *Knight v. Wiseman,* 590 F.3d 458, 463-64 (7th Cir. 2009).

## A. Deference to Edelman's Treating Physicians

Edelman first contends that the Fund arbitrarily rejected the opinions of his treating physicians, Drs. Kyncl, Hoffman, and Koch, in favor of the assessments prepared by Drs. Kale and Tawk, neither of whom examined him. Although the opinions of treating physicians generally are entitled to controlling weight in the Social Security context, plan administrators in ERISA cases are free to credit any reliable evidence over a treating physician's contrary evaluation. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825, 834 (2003). Medical findings based upon a "paper review" need not be accorded less weight simply because the reviewing physician did not examine the claimant personally. *Davis v. Unum Life Ins. Co. of America,* 444 F.3d 569, 577 (7th Cir. 2006).

The considerable differences in opinion among Edelman's treating physicians made it reasonable for the Fund to rely on Dr. Kale's and Dr. Tawk's independent assessments in determining whether Edelman was capable of performing work in a setting other than his current job. Indeed, while Dr. Kyncl opined that

Edelman was disabled from work of any kind, Drs. Hoffman and Koch found that he might be capable of non-exertional or sedentary tasks and Dr. Hoffman further noted that Edelman would be a suitable candidate for trial employment at a different job. Dr. Kyncl's restrictive assessment also was at odds with Dr. Blinsky's and Dr. Andrews' findings that Edelman had few postural limitations, was capable of carrying ten pounds on an occasional basis, and could sit at least six hours in an eight-hour work day.

Although Dr. Hoffman later submitted a second RFC evaluation in which he found Edelman's abilities to be more limited than he had indicated originally, his "updated" findings are somewhat dubious given that he had not examined Edelman since he completed his previous assessment more than six months earlier. The Seventh Circuit has cautioned against accepting at face value the opinions of treating physicians who act more like advocates for their patients' benefits claims than doctors rendering objective opinions. *Davis,* 444 F.3d at 578. With no apparent justification for Dr. Hoffman's abrupt change in opinion, there was cause for the Fund to question the objectivity of his second RFC report.

In contrast, there was no reason to doubt the reliability of Dr. Kale's and Dr. Tawk's independent evaluations. Indeed, both doctors conducted an exhaustive review of Edelman's medical

records and gave thorough consideration to the assessments of his treating physicians before determining that his symptoms did not preclude him from engaging in sedentary work. Their conclusions are consistent with various clinical findings, as well as Edelman's own reports, which establish that he experienced shortness of breath only upon physical exertion, not at rest, and that his symptoms had improved since he stopped smoking. Edelman's COPD, although severe, also appeared to be under control and he had not experienced an exacerbation of his condition since December 7, 2011. Moreover, while Edelman's cough-induced syncope made it too risky for him to continue working as a roofer, there was sufficient medical evidence that he was capable of other, less physically-demanding types of work. Both Dr. Kale's and Dr. Tawk's well-reasoned opinions thus find ample support in the record and the Fund was entitled to rely on their reports in denying Edelman's claim.

### B. Edelman's Vocational Abilities

Edelman next contends that the Fund erred by failing to conduct a vocational assessment, which he alleges would have confirmed that he lacks the education, skills, or experience necessary to secure sedentary employment. Although Edelman concedes that a "full-blown vocational evaluation" is not required in every ERISA case, he cites a handful of cases in which a denial of benefits was reversed because the plan

administrator failed to consider the claimant's individual vocational characteristics.

In *Quinn v. Blue Cross and Blue Shield Ass'n,* for example, the Seventh Circuit held that the administrator of the plan at issue had a duty to make "a reasonable inquiry into the types of skills [the claimant] possesse[d] and whether those skills [could] be used at another job that [could] pay her the same salary range as her job with [her previous employer]." *Quinn v. Blue Cross and Blue Shield Ass'n,* 161 F.3d 472, 476 (7th Cir. 1998). Similarly, in *Poulos v. Motorola Long Term Disability Plan,* Judge Elaine Bucklo held that "medical facts are relevant to, but not dispositive of, the disability determination." *Poulos v. Motorola Long Term Disability Plan,* 93 F.Supp.2d 926, 930 (N.D. Ill. 2000). The court thus concluded that, even though a medical examiner had found the plaintiff capable of sedentary work, the plan administrator should have considered the fact that she had no marketable skills before reaching a determination as to whether she was employable in other jobs. *Id.* at 931-32.

Unlike this case, however, both *Quinn* and *Poulos* involved disability plans that contained express language requiring an inquiry into the claimant's vocational abilities. Indeed, proof of disability under the plan in *Quinn* depended upon whether the claimant was "wholly prevented, by reason of mental or physical disability, from engaging in any occupation *comparable to that in*

*which he was engaged for the Employer,* at the time his disability occurred." *Quinn,* 161 F.3d at 474 (emphasis added). The plan defined "comparable occupation" as one that provided a "*similar salary range* for a person with *similar skills and education* as the claimant." *Id.* (emphasis added). Likewise, the disability plan in *Poulos* required the claimant to demonstrate an "inability to perform all of the normal duties of any occupation or employment for wage or profit *for which [she was] reasonably qualified by education, training or experience.*" *Poulos,* 93 F.Supp.2d at 929. (emphasis added). In contrast, the disability inquiry in this case does not turn specifically upon the claimant's age, skills, education, work experience, or the like. Rather, the question is one of general work capability.

In *Demirovic v. Building Service 32 B-J Pension Fund,* a case upon which Edelman relies heavily, the Second Circuit reviewed a disability plan similar to the one in this case. *Demirovic v. Building Service 32 B-J Pension Fund,* 467 F.3d 208 (2d Cir. 2006). The plan required proof of "[t]otal and permanent disability" such that the claimant was "unable to perform any gainful employment." *Id.* at 209-10. Despite the finding of two independent medical examiners that the plaintiff could perform sedentary work, the court overturned the plan administrator's denial of benefits, explaining that an abstract determination that the plaintiff was *physically* capable of sedentary work was

meaningless and that the administrator should have considered whether the plaintiff "could in fact find such sedentary work." *Id.* at 212-13. In other words, the court concluded that a determination as to whether the claimant could perform "gainful employment" necessarily hinged upon an analysis of the claimant's particular vocational circumstances. The court found that this inquiry could not be satisfied solely by "medical diagnosis." *Id.* at 213.

The trouble with *Demirovic* is that it appears to "interpret phrases such as 'unable to perform any gainful employment' and 'prevented from engaging in any occupation or employment for wages or profit' to mean an inability to (i) engage in employment yielding a livable income (ii) based on one's unique vocational circumstances." *Creelman v. Carpenters Pension & Annuity Fund of Philadelphia & Vicinity,* 945 F.Supp.2d 592 (E.D. Pa. 2013). Although that may be one reading of these phrases, it is not the only reasonable one. In *Creelman,* for example, the court reviewed plan language requiring proof that the claimant was "wholly prevented from engaging in any occupation or performing any work for wage or profit." *Creelman,* 945 F.Supp.2d at 597. The court held that the fund's administrator did not act arbitrarily and capriciously by determining that an individualized vocational assessment was not mandatory under the plan terms. *Id.* at 602. As the court explained:

> [I]t would seem reasonable to deny
> disability benefits where the Fund is of the
> view, based upon medical opinion, that the
> applicant is physically capable of some
> employment in the economy, without going
> into a detailed and individualized analysis
> of the applicant's educational and
> vocational circumstances.
>
> Indeed, many plans explicitly define
> disability as an inability to engage in
> employment for which the applicant is
> 'reasonably qualified by training,
> education, or experience.' The Ninth
> Circuit has noted that a plan incorporating
> this kind of terminology necessarily
> 'requires some individuation in the
> analysis' of benefits entitlement. Such
> language is not universal to all ERISA
> plans, however, and is absent from the
> provision here.
>
> The difference is material. ERISA was
> intended to offer employers 'large leeway to
> design disability and other welfare plans as
> they see fit,' and entitlement to benefits
> under any particular plan 'is likely to
> turn, in large part, on the interpretation
> of terms in the plan at issue.' Moreover,
> as the Supreme Court noted in *Black &
> Decker,* ERISA plans need not conform to
> either the benefit structure or procedural
> requirements of the Social Security program,
> which takes vocational abilities into
> account. . . . Diversity among plans is
> entirely permissible.

*Id.* (citations omitted).

Thus, ERISA does not impose a blanket requirement on plan administrators to obtain independent vocational expert analysis. Indeed, "there are many cases in which the Seventh Circuit has upheld a denial of benefits although the plan administrator did not have the claim reviewed by an independent vocational expert."

*Migdal v. Aurora Health Care, Inc.,* No. 05-CV-455, 2006 WL 2861101, at *6 (E.D. Wis. Oct. 5, 2006) (collecting cases). In this case, ample precedent supports the Fund's conclusion that the Plan's language did not require it to conduct an individualized vocational assessment after Drs. Kale and Tawk found him capable of sedentary work. Moreover, even if the Fund's determination were wrong, it is clear that its decision cannot be deemed so unreasonable as to be arbitrary and capricious. For these reasons, it would be inappropriate to overturn Edelman's adverse benefits determination on grounds that the Fund failed to engage in an in-depth vocational analysis.

## C. Edelman's SSA Disability Determination

Edelman next argues that the Fund arbitrarily disregarded the SSA's disability determination. Contrary to Edelman's assertion, however, the Fund considered the SSA award but found it inapposite because the SSA's disability standard was different from the Plan's and, in any event, the SSA's finding that Edelman was disabled as of May 2012 was irrelevant, since the Plan's rules required Edelman to establish that he was considered disabled prior to December 31, 2011.

The Seventh Circuit has "repeatedly emphasized that the SSA's determination of disability is not binding on employers under ERISA." *Love v. Nat'l City Corp. Welfare Benefits Plan,* 574 F.3d 392, 398 (7th Cir. 2009). Although SSA decisions are

sometimes relevant in cases where an ERISA plan employs the same disability criteria as that of the Social Security Act, the SSA's findings are by no means dispositive.  *Tegtmeier v. Midwest Operating Engineers Pension Trust Fund,* 390 F.3d 1040, 1046 (7th Cir. 2004).  Whether the SSA's award of benefits is instructive depends upon a comparison of the Social Security rules with the terms of the ERISA plan.  *Krolnik v. Prudential Ins. Co. of Am.,* 570 F.3d 841, 844 (7th Cir. 2009).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  While Edelman contends that the Plan's definition of disability is functionally similar to the SSA's definition, there are important differences that make the Plan's disability standard more stringent.  First, certain impairments qualify automatically as disabilities under the Social Security Regulations without inquiry into the claimant's actual work ability.  *See,* 20 C.F.R. § 404.1520(a)(4)(iii).  In contrast, the Plan does not deem any impairment or combination of impairments to be disabling categorically.  Second, the SSA's disability determination turns in many cases upon the claimant's age, education, and work experience – factors which are not

considered under the Plan.  *See,* 20 C.F.R. Pt. 404, Subpt. P, App'x 2.  Third, the SSA uses certain presumptive wage guidelines to determine whether a claimant can engage in "substantially gainful activity."  20 C.F.R. § 404.1574.  The Plan, on the other hand, requires only that the claimant be unable to perform work "for wage or profit."  No specific earnings are necessary to meet that standard.  Although the Fund might be barred from denying benefits to a claimant who engages only in "some minimal occupation, such as selling peanuts or pencils, which would yield only a pittance," *Helms v. Monsanto Co., Inc.,* 728 F.2d 1416, 1421 (11th Cir. 1984), it would not be an abuse of discretion for the Fund to require an income threshold different from the Social Security Regulations.  Finally, for a variety of reasons, "the SSA sometimes grants [disability] benefits to individuals who not only can work, but are working."  *Cleveland v. Policy Mgmt. Systems Corp.,* 526 U.S. 795, 805 (1999).  Under the Plan, however, the ability to work in any capacity would nix a claim for benefits.

Apart from the fact that there are critical differences between the SSA's and the Plan's respective disability standards, it is difficult to see how Edelman's SSA determination could have been instructive to the Fund, since it states only that he was awarded benefits based upon "medical and vocational considerations."  Moreover, although the decision cites no

particular rule, it seems likely that the SSA's disability finding was mandated under the SSA's Medical-Vocational Rules (sometimes called the "Grids") – criteria that would be irrelevant to the Fund's determination. In any event, the record shows that the Fund considered Edelman's SSA determination to the extent that it could but found the decision to be unilluminating on the issue of whether Edelman qualified for benefits under the Plan's terms. The fact that the Fund reached a decision contrary to the SSA's determination does not demonstrate that the Fund's denial of Edelman's claim was arbitrary or capricious.

### D. Compliance With ERISA Procedural Requirements

Finally, Edelman contends that the Fund violated certain ERISA procedural requirements by failing to identify Dr. Tawk by name on his reports and instead referring to him only as MRIoA reviewer "1099." Under ERISA, employee benefit plans must have claims procedures in place that "[p]rovide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination." 29 C.F.R. § 2560.503-1(h)(3)(iv). Although it is true that the MRIoA reports did not identify Dr. Tawk by name, it is sufficient that the reports did list his credentials, including his medical specialties, board certifications, and years of practice. *See, e.g., Jacobs, Jr. v. Guardian Life Ins. Co. of America,* 730 F.Supp.2d 830, 850

(N.D. Ill. 2010). Moreover, nothing in the ERISA regulations prohibits a plan from consulting with an unidentified reviewing physician. Rather, "the regulations simply require plans to provide a procedure whereby participants can discover the [identity] of the reviewer[]." *Gibala v. Eaton Corp. Long Term Disability Plan For U.S. Employees,* No. 05 C 5802, 2006 WL 3469540, at *12 (N.D. Ill. Nov. 30, 2006). Here, there can be no question that the Fund complied fully with the disclosure requirements under ERISA, since Edelman concedes that the Fund provided Dr. Tawk's name to him upon request.

Edelman also complains that the Fund violated 29 C.F.R. § 2560.503-1(h)(3)(v) by having Dr. Tawk complete multiple reviews of his file. 29 C.F.R. § 2560.503-1(h)(3)(v) prohibits plan administrators from consulting on appeal with reviewing medical specialists who "consulted in connection with the adverse benefit determination that is the subject of the appeal." Dr. Tawk was not consulted in connection with the Fund's initial adverse benefit determination that was the subject of Edelman's appeal. Rather, Dr. Tawk consulted *during* Edelman's appeal and the only reason he issued multiple reports was because Edelman submitted evidence in a piecemeal fashion, requiring the Fund to forward his records to MRIoA on three separate occasions. At any rate, no adverse benefits decision was made based upon Dr. Tawk's reports until the Fund's final review on July 20, 2012. In these

circumstances, it is clear that the Fund's consultation with Dr. Tawk did not violate the ERSIA regulations.

## V.   CONCLUSION

For the reasons stated herein, the Fund's Motion for Summary Judgment [ECF No. 25], and Motion to Strike [ECF No. 20] are granted.  Edelman's Motion for Summary Judgment [ECF No. 16] is denied.


**IT IS SO ORDERED.**


_____
Harry D. Leinenweber, Judge
United States District Court

Date: 4/24/2014